IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JAN 2 3 2004

| | | |
|---|---|---|
| COMPUTER ASSOCIATES INTERNATIONAL, INC., a Delaware corporation, | ) | Case No. 02 C 4721 |
| Plaintiff, | ) | |
| v. | ) | Judge Moran |
| QUEST SOFTWARE, INC., a California corporation, MICHAEL J. FRIEL, an Illinois resident, DEBRA A. JENSON, an Illinois resident, ROBERT M. MACKOWIAK, an Illinois resident, ELIZABETH W. WAHLGREN, an Illinois resident, and FRANK L. BISOTTI, a Wisconsin resident, | ) | Magistrate Judge Mason |
| Defendants. | ) | |

FILED
JAN 1 6 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DEFENDANTS' MOTION TO STRIKE THE TESTIMONY OF MARTIN HUBEL**

CA's claims of copyright infringement and trade secret misappropriation rest on the opinions of a singe "expert" – Martin Hubel. Hubel has never worked with the programming languages used to develop the products at issue, admits making more than a dozen errors in his declaration, did not even attempt to perform the legally required AFC test, has never read the Free Software Foundation's General Public License, and is not offering any opinions regarding the alleged value of CA's alleged trade secrets. In other words, Hubel is in no way qualified to render the opinions he offers. To the contrary, he appears to be nothing more than a mere mouthpiece for CA's overbroad accusations. Therefore, Defendants respectfully request that this Court strike Hubel's declaration and preclude Hubel's proffered testimony.

As this Court is well aware, the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that this Court exercise "gatekeeping" responsibilities to assure that expert testimony is well-founded and strictly complies with the

97

requirements of Federal Rules of Evidence 702 and 403. *See e.g. Deputy v. Lehman Brother, Inc.*, 345 F.3d 494, 505 (7th Cir. 2003); *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 642-43 (7th Cir. 1995) (criticizing district court for abdicating its "gatekeeping" function). The "trial judge's general gatekeeping obligations" apply to all types of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

In this case, Hubel's opinions do not pass muster under the *Daubert* analysis because Hubel is not qualified, his methodology is not reliable, and he failed to consider key facts. As a result, Hubel's opinions regarding alleged copying of the EDBA code, and his opinions regarding alleged useful secrets, are not admissible under Rules 403 and 702.

For the above reasons, which are more fully described in Defendants' supporting memorandum, Defendants respectfully respect that that this Court strike Hubel's declaration and bar him from offering any opinion in this matter.

Dated: January 16, 2004

Respectfully submitted,

Brian D. Sieve, P.C. (6199741)
Arthur Gollwitzer III (6225038)
Michael J. Newman (6256447)
Colby Anne Kingsbury (6272842)
Alma M. Lugtu (6277931)
David Rokach (6279703)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 Telephone
(312) 861-2200 Facsimile

ATTORNEYS FOR DEFENDANTS

## Certificate of Service

I, Arthur Gollwitzer III, an attorney of record in this matter, certify that before 5:00 p.m. on January 16, 2004, I caused the following documents:

- **Notice of Defendants' Motions**
- **Notice of Defendants Motion for Leave to File an Opposition Brief in Excess of Fifteen Pages**
- **Defendants' Motion for Leave to File Their Amended Answer, Affirmative Defenses, and Counterclaim**
- **Memorandum in Support of Defendants' Motion for Leave to File Their Amended Answer, Affirmative Defenses, and Counterclaim**
- **Defendants' Amended Answer, Affirmative Defenses, and Counterclaim**
- **Defendants' Motion to Strike the Testimony of Martin Hubel**
- **Memorandum in Support of Defendants' Motion to Strike the Testimony of Martin Hubel**
- **Defendants' Motion for Leave to File an Opposition Brief in Excess of Fifteen Pages**
- **Defendants' Memorandum in Opposition to Computer Associates' Motion for Preliminary Injunction** (including supporting Declarations from Bruce Webster, Edward Yourdon, Michael Friel, Debra Jenson, Elizabeth Wahlgren, Frank Bisotti, and Juli Ackerman, an Appendix of Exhibits, and an Appendix of Deposition Testimony)

to be served by messenger delivery upon the following counsel of record:

John F. Zabriskie
Jason Keener
FOLEY & LARDNER
321 N. Clark Street
Chicago, Illinois 60611
Facsimile No. 312.644.7558

[signature]

Arthur Gollwitzer III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| COMPUTER ASSOCIATES INTERNATIONAL, INC., a Delaware corporation, | ) | |
| Plaintiff, | ) | Case No. 02 C 4721 |
| v. | ) | Judge Moran |
| QUEST SOFTWARE, INC., a California corporation, MICHAEL J. FRIEL, an Illinois resident, DEBRA A. JENSON, an Illinois resident, ROBERT M. MACKOWIAK, an Illinois resident, ELIZABETH W. WAHLGREN, an Illinois resident, and FRANK L. BISOTTI, a Wisconsin resident, | ) | Magistrate Judge Mason |
| Defendants. | ) | |

DOCKETED
JAN 2 3 2004

FILED
JAN 1 6 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE THE TESTIMONY OF MARTIN HUBEL**

Brian D. Sieve, P.C. (6199741)
Arthur Gollwitzer III (6225038)
Michael J. Newman (6256447)
Colby Anne Kingsbury (6272842)
Alma M. Lugtu (6277931)
David Rokach (6279703)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 Telephone
(312) 861-2200 Facsimile

ATTORNEYS FOR DEFENDANTS

January 16, 2004

97

CA's claims of copyright infringement and trade secret misappropriation rest on the opinions of a singe "expert" – Martin Hubel. Hubel is in no way qualified to render the opinions he offers. Hubel has never worked with the programming languages used to develop the products at issue, admits making more than a dozen errors in his declaration, did not even attempt to perform the legally required AFC test, and has never read the Free Software Foundation's General Public License. In short, he appears to be nothing more than a mouthpiece for CA's baseless accusations.

As this Court is well aware, the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that this Court exercise "gatekeeping" responsibilities to assure that expert testimony is well-founded and strictly complies with the requirements of Federal Rules of Evidence 702 and 403. *See e.g. Deputy v. Lehman Brother, Inc.*, 345 F.3d 494, 505 (7th Cir. 2003); *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 642-43 (7th Cir. 1995) (criticizing district court for abdicating its "gatekeeping" function). The "trial judge's general gatekeeping obligations" apply to all types of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). In this case, Hubel's opinions do not pass muster under the *Daubert* analysis. Defendants respectfully request that the Court strike Hubel's declaration and preclude Hubel's proffered testimony.

**BACKGROUND**

In support of its motion for a preliminary injunction, CA offered the declaration of Martin Hubel, a self-employed consultant. In his declaration, Hubel purports to opine that three specific parts of Quest's "Quest Central for DB2" product were either copied in part from CA's EDBA source code or are "similar" to portions of the EDBA code: (1) the "parser" (Hubel Dep. 44-45, Ex.A); (2) the "analysis engine" (*id.*); and (3) the "job scheduler." (*Id.*) Hubel contends that the parser and parts of the job scheduler were literally copied from EDBA, and that

part of the Quest analysis engine is "similar" to the EDBA analysis engine. Hubel also includes in his declaration vague suggestions that parts of the EDBA analysis engine are "useful secrets," a term he coined for this case.

Hubel filed his original declaration and supporting exhibits on October 6, 2003. Just seven weeks later, he filed a "Corrected Declaration." (Exs.B and C respectively) As Hubel explained at his deposition, his original declaration included at least five to seven errors (Hubel Dep. 41-42), errors that were significant enough to justify an entirely new report.

Upon receiving Hubel's corrected declaration, Defendants began analyzing Hubel's opinions. What they discovered was nothing short of astonishing. It became immediately apparent that Hubel had absolutely no education or experience that qualified him to render the opinions he purports to offer. Moreover, Hubel employed a methodology that is completely subjective, and his work product is replete with errors.

Even a quick review of Hubel's deposition confirms that he has no basis for offering the opinions that he does. In many instances, he does not even understand the technology at issue in the case. This memorandum highlights for the Court some of the more significant problems with Hubel's purported testimony. However, Defendants urge this Court to review the entire Hubel deposition transcript because doing so confirms that Hubel must be excluded.[1]

## I. Hubel Is Not A Qualified Expert.

Hubel admits that:

- he has never been retained as a testifying expert in litigation (Hubel Dep. 7);

[1] To that end, Defendants have attached the entire Hubel transcript to this Memorandum as Ex.A.

- he has never been hired to do any forensic analysis of source code (*id.* 8);
- he has never been asked to offer an opinion as to whether source code was copied from another product (*id.* 9);
- he has never before performed the abstraction/ filtration/ comparison analysis ("AFC test") set forth in *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2nd Cir. 1992) (*id.* 10); and
- he has never been asked to offer an opinion that something is a "useful secret." (*Id.* 27)

In short, Hubel has never before done anything related to the subject matter of his work in this case. Perhaps realizing this, Hubel tried to defend his expertise this way: "I know how to read source code, and as such, I can go through and look to see whether there are similarities between pieces of source code." (Hubel Dep. 8) So what? Millions of programmers can read source code, but that does not make them experts in forensic analysis.

Perhaps most troubling, Hubel does not even have any expertise in the technical issues in which he purports to opine. Hubel concedes that:

- he has not done any development work with C or C++ computer languages (Hubel Dep. 30), and has no experience with Delphi (*id.* 35), even though Quest Central is written in C++ and Delphi (*id.*);
- he has never written a parser or worked with Flex or Bison, the two open source programs used to develop the parser at both Platinum and Quest (*id.* 183);
- he does not understand how Quest's job scheduler stores jobs for future execution (*id.* 261-262); and
- he has never read the entirety of the Free Software Foundation's General Public License ("GPL"), which is relevant to whether or not CA can assert intellectual property rights over the parts of the code he places at issue. (*Id.* 20)

Hubel has no resources to fill the gaps in his knowledge. In one instance, Hubel admitted that "I didn't have anyone else to ask" other than his assistant, who had no more knowledge than Hubel on how EDBA works. (*Id.* 68)

## II. Hubel's Methodology Is Not Reliable.

Hubel began his efforts to compare the EDBA code with Quest Central code by using a program called SIM that "was available over the Internet." (Hubel Dep. 13) The source codes being compared are fed into SIM as two input files, and SIM then generates an output file comparing the relative similarities of the two files. (*Id.* 16) Hubel used SIM to compare Quest Central and EDBA, but he discarded the output file comparing the two because he "did not find it as helpful." (*Id.*)

Hubel undertook a second attempt at a file comparison using another program whose name he cannot remember, and which he has since deleted from his hard drive. (Hubel Dep. 18) The reason Hubel stopped using this unnamed program is that "the computer programs would often not find matches" in places where he believed the code looked similar. (*Id.*) This was "the same problem" Hubel had with other attempts to use comparison software. (*Id.*) Essentially, Hubel abandoned his original methodology because neither of the comparison software programs he used produced results that were sufficiently favorable for CA.

Hubel also chose not to consider the results of a "module affinity analysis" performed by Mr. Leonid Spektor[2] at Hubel's request, because "it was a little too much to go through." (Hubel Dep. 14-15) Instead, Hubel and Spektor manually read through the source codes of Quest Central and EDBA to check for similarities. (*Id.* 17) But EDBA and Quest Central each contain thousands of files amounting to more than two million lines source code in each program. (*Id.* 156; Webster Decl. ¶ 23) Because it was obviously impractical to do a "hand search" of such code, Hubel relied on CA's counsel to tell him where to look for similarities.

[2] Leonid Spektor was retained by CA or Hubel to assist in Hubel's work. (Hubel Dep. 11-12) CA has not produced any report from Spektor.

(*Id.* 157-158) Hubel testified that Foley & Lardner attorney Jason Keener "had been looking at some of the source code" and would direct Hubel to look at specific directories. (*Id.* 157) Hubel would then "come back and say, 'I found similarities in this directory.'" (*Id.*) CA lawyers also specifically directed Hubel to the job scheduler and the analysis engine, with orders such as "[r]ead this document and look here." (*Id.* 158) Thus, Hubel's contribution as an expert was essentially to do a quick visual review of CA's counsel's conclusions of copying, and then repackage those conclusions in the guise of "expert" testimony.

## III. Hubel's Report Has Many Substantive Errors.

One might expect that Hubel would have confirmed that his "corrected" declaration really was "correct." Not so. During his deposition, Hubel admitted ***more than a dozen times*** that his report was inaccurate or should be corrected. Hubel's errors are pervasive and cast doubt over the reliability of his entire declaration. For the Court's convenience, Defendants group these errors into four broad categories.

1. *Errors identifying allegedly copied lines of code*: Hubel supposedly documented his findings of alleged similarities between Quest Central and EDBA by highlighting the relevant lines of source code in Exhibit G to his declaration (Hubel Dep. 73-74), as well as in Appendix K. (*Id.* 248-249) In at least four instances, Hubel admitted that he had erroneously identified similarities where the code was in fact *not* similar:

- Hubel agreed that because EDBA does not support the "nickname" object type, Quest Central cannot be similar to EDBA with regard to code addressed "nickname." (Hubel Dep. 72-73) He then admitted that his declaration did indicate similarities with regard to such code, and conceded that "in this particular case, I guess I could go back and correct that" by "removing highlighting off the REFs in these three cases." (*Id.* 75)

- Hubel conceded that this mistake infected other similarities he had identified in his report, stating that "whether or not it's correct or not to

remove the highlighting from "ref by" . . . is something I'd have to go back and consider again." (*Id.* 84)

- Hubel agreed that the "drop impacted alias rule" is not found in EDBA and cannot be the source of similarities. (*Id.* 79-80) On this basis, Hubel admitted that he had once again incorrectly marked similarities, and concluded that "I have no trouble with what we've just talked about, removing the highlighting off Lines 268, 269, 270." (*Id.* 80-81)

- Part of the source code for the job scheduler came from publicly available software distributed by the Microsoft Developer Network. (*Id.* 272-273) Hubel admitted that code he had believed was copied from EDBA in fact originated in the Microsoft software, and agreed that "I would remove the highlighting from those and update my line counts." (*Id.* 279-281)

- Defendants' expert, Bruce Webster, identifies numerous additional errors that Hubel made trying to identify copied lines of code. (*See e.g.* Webster Dec. ¶¶ 32, 78-91, 115, 120-24, Ex.D)

While Hubel displays a cavalier attitude toward his mistakes, they are significant. Hubel has provided the Court exhibits that are supposed to identify the specific lines of code that he claims were copied. Hubel no doubt hoped that that by using yellow highlighting on his exhibits, he would convey to the Court the impression that there was massive copying. That is simply not true, and Hubel's supporting materials are misleading to the extent they show "copied" code that was not in fact "copied."

2. *Errors regarding the functionality of the programs*: Hubel admitted to a variety of errors in his descriptions relating to the functionality of the programs at issue. He also admitted that language in his report was incorrect or misleading in a number of places. These errors show a general lack of understanding of the software at issue in this case and a sloppy methodology:

- Paragraph 131 of Hubel's corrected declaration states that when a table is dropped, "other objects such as its indexes, views, triggers, and packages are also dropped automatically by DB2." (Hubel Dep. 91-92) That is wrong. Hubel conceded in his deposition that packages "would be marked invalid, rather than dropped," and "perhaps I could go back and restate that." (*Id.* 92-94)

- Paragraph 140 contains a table showing the analysis rules, including arrows indicating how rules relate to objects. (*Id.* 115) In one instance, Hubel agreed "that arrow may be wrong . . . I might have gotten my platforms mixed up." (*Id.* 119) In the same table, Hubel admitted that he may have identified the wrong rules and "I'd have to go back and check" whether it should refer to the "drop related" rule or "drop impacted" rule. (*Id.* 121) This same mistake is present in paragraph 152. (*Id.* 125-26)

- As part of his analysis, Hubel compared the analysis rules in Quest Central to rules identified in IBM documentation. (*Id.* 99-100) Unfortunately, Hubel now believes that he "did not look at the correct manual version to find whether or not these rules were correct." (*Id.* 100)

- Paragraph 93 of Hubel's corrected declaration states that comments in Quest Central could be changed without recompiling the program. (Hubel Cor. Dec. ¶ 93; Hubel Dep. 217) Under questioning, Hubel admitted that "[p]erhaps I misstated. I don't know." (Hubel Dep. 219)

- Paragraph 135 of Hubel's corrected declaration indicates that the analysis rules in Quest Central are contained in "analysis lists." Hubel admitted that this description was based on the fact that they "might look like lists. I'm not sure that they do identically to me, but one could consider them like lists." (*Id.* 95-96)

3. *Math errors*: A table in paragraph 77 of Hubel's declaration indicates that in the February 9 version of Quest's code, Hubel believed that Quest copied "100%" of CA's code from the db2.y file in the parser. That is demonstrably false, and Hubel conceded that his table overstated his findings. (Hubel Dep. 178-179) In fact, even using Hubel's erroneous count of "copied" lines, Hubel admitted that the 100% number should only read 39%. (*Id.* ¶¶ 81-82) Hubel also admitted that he made a similar math error in his calculations related to the db2.l file. (*Id.* 180-82). Again, this misleading and false presentation of evidence casts doubt over Hubel's entire declaration. Finally, Hubel's math methodology is so bad that, using Hubel's logic, he apparently found more copying than there are lines of code! (*See* Webster Dec. ¶¶ 81 and table (Hubel's math leads to a claim that 1812 lines of Quest's UDB.l file were copied from DB2.l, but there are only 1520 lines of code in Quest's UDB.l))

4. *Technical errors*: Hubel's declaration contains a variety of technical errors. For example paragraph 81 incorrectly indicates the page where particular code is found (Hubel Dep. 186-187), and page 32 of Appendix D contains an incorrect date. (*Id.* 192)

## IV. Hubel Failed to Consider Key Issues.

Hubel expects to testify that parts of EDBA are "useful secrets." (Hubel Cor. Dec. ¶ 3; Hubel Dep. 27) This testimony is apparently intended to support CA's allegation that EDBA is a trade secret under the Illinois Trade Secrets Act (the "ITSA"). However, Hubel has not considered the elements necessary to support such a conclusion. Specifically, Hubel admits the following:

- he never read the ITSA or any cases interpreting it (Hubel Dep. 22);
- he did not evaluate the economic value of anything identified as a "useful secret" in his declaration (*id.* 25);
- he made no effort to determine whether things he claimed were "secret" were actually known in the industry (*id.* 167-168);
- he has not checked whether competitors have come up with their own versions of solutions that he claims give CA a competitive advantage (*id.* 237); and
- he did not differentiate "useful secrets" from information that he admits "people are allowed to take with them" when they change employers. (*Id.* 165-166)

Hubel also intends to testify regarding copying and similarities between Quest Central and EDBA. (Hubel Cor. Dec. ¶ 3) On this score, Hubel admits the following deficiencies in his work:

- he does not know whether several instances of code that he claims were copied from CA were "dead code" that are not used in Quest Central; (Hubel Dep. 263-267; Webster Dec. ¶ 116);
- he has not looked at any naming standards in connection with this case, and has not considered what impact naming standards may have on the

alleged similarities he found in EDBA and Quest Central file names (Hubel Dep. 36);

- he did not consider the terms of the GPL in his analysis (Hubel Dep. 20; Webster Dec. ¶¶ 92-105);

- he did not use an AFC analysis in reaching his conclusions that Quest Central 's analysis engine contains source code that was not literally copied from CA (Hubel Dep. 11; Webster Dec. ¶¶ 24-25); and

- he has no specific evidence that any job scheduler code he alleges was copied from EDBA is present in version 3.0 of Quest Central, the last version of Quest Central that Hubel supposedly reviewed. (Hubel Dep. 259; Webster Dec. ¶ 117)

## ARGUMENT

Courts in this district have frequently recognized that they must serve as gatekeepers and block faulty expert testimony. *See, e.g. Gentieu, et. al. v. Tony Stone Images/Chicago, Inc.*, 214 F. Supp. 2d 849 (N.D. Ill. 2002); *Ayers v. Robinson,* 887 F. Supp. 1049, 1058 (N.D. Ill. 1995). The starting point for assessing the admissibility of expert testimony is Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles, and methods and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2004). "This Rule essentially codifies the principles annunciated . . . under *Daubert*," requiring the trial court "(a) to determine whether the expert is qualified in the relevant field and (b) to examine the methodology the expert used in reaching his conclusions." *Spearman Indus., Inc. v. St. Paul Fire and Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1095 (N.D. Ill. 2001).

The "trial court's threshold role" in evaluating the reliability and relevancy of expert testimony "has become more proactive, as is signaled by the *Daubert-Kumho* references to its "gatekeeping" function." *Gentieu*, 214 F. Supp. 2d at 852. *Daubert* requires this Court to make a twofold determination of whether an expert's opinions: (1) "have a reliable basis and are grounded in the methods and procedures of science, *as opposed to subjective belief or unsupported speculation*," and (2) "fit the case at hand" – "in essence a specialized relevance inquiry." *Ayers*, 887 F. Supp. at 1058 (emphasis added).

If an expert's testimony satisfies Rule 702, the Court must still assess whether the proposed testimony gets over a "second major hurdle" – Rule 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Id.* at 1058-59; *see also Orr v. Indiana Harbor Belt R.R. Co.*, 1997 WL 570767, *1 (N.D. Ill. 1997) (granting motion in limine to exclude evidence which "fails the [Rule] 403 balancing test"). As Judge Shadur has explained, the Rule 403 balancing test is critically important in the context of expert testimony, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty of evaluating it." *Ayers* at 1059 (*quoting* J. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)); *see also Daubert*, 509 U.S. at 595.

Like the purported expert witness criticized by the Seventh Circuit in *Minasian*, Hubel's testimony in this case "exemplifies everything that is bad about expert witnesses in litigation." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). Hubel should be precluded from testifying.

## I. Hubel Lacks Appropriate Qualifications And Expertise.

As the explained above, Hubel admits to having absolutely no prior experience in forensic computer code analysis. Just as troubling, Hubel's testimony demonstrates that he lacks a fundamental understanding of the complex computer code issues raised in this case. As such, his testimony is improper. *See Ueland v. United States*, 291 F.3d 993, 997 (7th Cir. 2002) (criticizing and reversing trial court's ruling that lack of qualifications goes only to weight of expert testimony).

## II. Hubel Used Unreliable Methods.

Essentially, Hubel placed two samples of source code side by side and concluded that "[g]ee, these look identical for 20 or 30 lines." (Hubel Decl. ¶¶ 17-18) Such methods do not satisfy *Daubert*, as they merely express Hubel's own subjective observations and discretion, and contain no concrete guidelines that can be tested by the analysis and criticism of others. *See Champan v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) ("[p]ersonal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert's* most significant guidepost"). The veracity of Hubel's visual scan is rendered more absurd by the fact that he is not even familiar with the particular programming language in which this code was written. (Hubel Dep. 30, 35)

Hubel's crude "analysis" is further unacceptable because it was guided by CA's counsel. *See Braun v. Lorillard Inc.*, 84 F.3d 230, 234-235 (7th Cir. 1996). Rather than allowing Hubel to work through the entire source code and form his own opinions, CA's counsel pointed Hubel to particular portions of code they believed to be similar. (Hubel Dep. 157-158) Courts soundly reject such attempts to offer counsel's conclusions repackaged as expert testimony. *US E.E.O.C. v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) ("proffered expert must 'bring to the jury more than the lawyers can offer in argument'").

Hubel's lack of objectivity is further shown by the fact that he abandoned the results of his first two comparisons between Quest Central and EDBA because they did not reach the conclusions he was expected to produce. (Hubel Dep. 16-18) By contrast with the makeshift and unverifiable approach actually adopted by Hubel, these first two evaluations used computer software designed by impartial third-parties to compare source codes. (*Id.* 12-14) Nevertheless, Hubel stopped using these programs because their results were less favorable than he and CA would have liked. (*Id.* 18) In fact, he "got so frustrated" that he deleted the comparison software from his hard drive, and claims that he cannot even remember the name of one of the programs. (*Id.*) This conduct deprived Defendants of the opportunity to review the objective results of the analyses conducted by software designed to compare code, which are based on algorithms that can be subjected to analysis and criticism by others. Cycling through different methods of testing until the results meet the experimenter's taste hardly meets "the standard of intellectual rigor that characterizes the practice of an expert" in any field. *See Kumho*, 526 U.S. at 152.

Moreover, Hubel's work is riddled with omissions and errors. The general disarray of his work confirms that CA is using him as a "a highly qualified puppet" to foist its litigation positions upon this Court in the form of expert conclusions. *See Dataquill Ltd. v. Handspring, Inc.*, No. 01 C 4635, 2003 WL 737785, *4 (N.D. Ill. Feb. 28, 2003).

## III. Hubel's Specific Opinions On The Three Parts Of The Quest Code He Places At Issue Are Also Fatally Deficient.

Hubel's shortcomings undercut his conclusions on each of the three issues on which he purports to offer opinions – the analysis engine, the parser and the job scheduler. On this score, Hubel's opinions fail the "fit" test of *Daubert*.

### A. Analysis Engine

CA argues in its brief that because it is asserting literal copying, there is no need to "resort to the abstraction test for non-literal copying." (CA Mem. 30) However, Hubel concedes that Quest did not copy any EDBA source code in the analysis engine. (Hubel Dep. 50) Instead, Hubel asserts a claim of non-literal copying. (*Id.* 50-51) Yet despite CA's implied concession that the AFC test is needed for a claim of non-literal copying, Hubel admits that he has never before conducted an AFC analysis and did not do so in this case. (*Id.* 10-11)

Hubel's "eyeball" approach resulted in errors that are hard to miss. One of the supposed "similarities" found by Hubel in the analysis engine are the rules for DROP and ALTER functions accommodated by IBM's DB2 database. (Hubel Dep. 54-56) Hubel now concedes that three of those rules – the "drop prevent," "drop impacted," and "drop related" rules – can be easily derived from the "Drop Matrix" section of the IBM SQL Reference Manual (*id.* 113-14), and that he is not sure that he looked at the correct version of the manual while preparing his declaration. (*Id.* 100) Another alleged "similarity" is the use of linked lists for inventory edits. (Hubel Dep. 133; Webster Dec. ¶ 109) Under questioning, Hubel conceded that it would not surprise him if this would be the first or second technique that anyone setting out write such software would consider using. (*Id.* at 135) Hubel also admits that he incorrectly highlighted a number of Quest's rules that supposedly matched EDBA. (*Id.* 75-84) These examples illustrate why Hubel's visual scan is not a reliable method for evaluating similarity.

### B. Job Scheduler

Hubel claims that Quest's job scheduler contains several hundred lines of code copied from EDBA, which he admits makes up a "relatively small" portion of the job scheduler's functionality. (Hubel Dep. 247-248) Most importantly, however, he concedes that his declaration contains *no evidence* showing that any of this code is in Quest Central version 3.0.

(Hubel Dep. 259; Webster Dec. ¶ 117) Appendix K of Hubel's declaration, which supposedly contains a comparison between EDBA and Quest Central, refers only to an earlier version of Quest's software. (Hubel Cor. Dec. Appendix K)

Hubel also admits that he does not know whether parts of the code he claims are copied are actually "dead code" that is not used by Quest Central. (Hubel Dep. 263-267; Webster Dec. ¶ 116) Finally, Hubel conceded that much of the code he identified as copied came from a bowling program that Bisotti wrote on his own time prior to joining Platinum. (Hubel Dep. 275-276; Webster Dec. ¶ 115) Source code for the job scheduler also came from publicly-available Microsoft Development Network software. (Hubel Dep. 272-273; Webster Dec. ¶¶ 120-21) In one instance, Hubel admitted that several lines of code he marked as copied from EDBA actually originated in the Microsoft code. (Hubel Dep. 278-281) Again, this testimony confirms that Hubel's opinions miss the mark on relevance and materiality.

**C. Parser**

Hubel states in his declaration that three components of the parser show common source code between EDBA and Quest Central: (1) the Bison utility (Hubel Cor. Dec. ¶¶ 90-92); (2) the lexical file (*id.* ¶ 77); and (3) the grammar file. (*Id.*) With regard to the Bison utility, Hubel admits that he failed to consider the impact of the GPL on CA's proprietary rights, rendering his conclusions of inappropriate copying meaningless. (Hubel Dep. 20) Hubel also concedes that the grammar file is formulated using error corrections generated by the Bison program, and a published reference book called "Lex and Yacc." (*Id.* 197-198) Nevertheless, Hubel fails to account for the impact of these public domain sources on producing similar code.

**CONCLUSION**

It is hard to imagine an expert more unqualified, more unprepared, and who made more mistakes, than Martin Hubel. Hubel has no business testifying in this case, and he certainly

has no business making the kinds of serious accusations that he has leveled against the Defendants. For the above reasons, Defendants respectfully respect that that this Court strike Hubel's declaration and bar him from offering any opinion in this matter.

Dated: January 16, 2004

Respectfully submitted,

Brian D. Sieve, P.C. (6199741)
Arthur Gollwitzer III (6225038)
Michael J. Newman (6256447)
Colby Anne Kingsbury (6272842)
Alma M. Lugtu (6277931)
David Rokach (6279703)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 Telephone
(312) 861-2200 Facsimile

ATTORNEYS FOR DEFENDANTS